# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP),** | |
| Plaintiff, | Case No. 1:24-cv-05558 |
| v. | Judge Sara L. Elllis |
| **Northwestern University**, et al., | |
| Defendants. | |

## PLAINTIFF'S RESPONSE TO THE DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of contents ...................................................................................... i

Table of authorities ................................................................................... ii

   I.  Response to the defendants' statement of facts ............................................. 1

   II. FASORP has alleged Article III standing .................................................... 2

   III. FASORP has alleged a claim on which relief may be granted against
        Northwestern University ........................................................................ 14

     A. FASORP has alleged a Title VI claim against Northwestern ................. 15

        1. FASORP's members are "applicants" to a federally funded
           program, and they are also "intended beneficiaries" of and
           "participants" in a federally funded program ............................ 15

        2. FASORP may assert employment-discrimination claims under
           Title VI because university faculty are the "primary
           beneficiaries" of federal research grants ............................... 16

        3. The defendants' claims that FASORP alleged "insufficient facts"
           are meritless.................................................................. 18

     B. FASORP has alleged a Title IX claim against Northwestern with
        respect to sex discrimination on the Law Review .................................. 24

     C. FASORP has alleged a section 1981 claim against Northwestern .......... 25

Conclusion ............................................................................................. 28

Certificate of service............................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)..............................2, 6, 13

*Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937) ...................................27

*Agbefe v. Board of Education of City of Chicago*,
    538 F. Supp. 3d 833 (N.D. Ill. 2021) ...............................................................24

*Ahern v. Board of Education of City of Chicago*,
    133 F.3d 975 (7th Cir. 1998) ............................................................................16

*Alexander v. Gardner–Denver Co.*, 415 U.S. 36 (1974) .........................................25

*American Institute of Design v. Riley*,
    969 F. Supp. 936 (E.D. Pa. 1997) .....................................................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................passim

*Ass'n of Proprietary Colleges v. Duncan*,
    107 F. Supp. 3d 332 (S.D.N.Y. 2015).................................................................17

*Association of Data Processing Service Organizations, Inc. v. Camp*,
    397 U.S. 150 (1970) ..........................................................................................12

*Babb v. Wilkie*, 589 U.S. 399 (2020) ...................................................................28

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................4, 7

*Bennett v. Roberts*, 295 F.3d 687 (7th Cir. 2002) .................................................26

*Brownlee v. Conine*, 957 F.2d 353 (7th Cir. 1992)...................................................7

*Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009) .............................................5, 22

*Carney v. Adams*, 592 U.S. 53 (2020) .............................................................passim

*Cartagena v. Secretary of the Navy*, 618 F.2d 130 (1st Cir. 1980) ...........................8

*Christopher v. Harbury*, 536 U.S. 403 (2002) ...................................................1, 14

*Cieslik v. Board of Education of City of Chicago*,
    No. 1:19-CV-05553, 2021 WL 1172575 (N.D. Ill. Mar. 29, 2021)...................18

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................2, 6, 13, 23

*Comcast Corp. v. National Ass'n of African-American Owned Media*,
    589 U.S. 327 (2020) ..........................................................................................26

*Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490 (S.D.N.Y. 2022) .........................9

*Doe v. Mercy Catholic Medical Center*, 850 F.3d 545 (3d Cir. 2017) ....................24

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) .........................................27

*Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991).............................11

*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................................4

*Graham v. Board of Education*, 8 F.4th 625 (7th Cir. 2021) ..................................26

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .........................................................passim

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ......................................................8, 26

*J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127 (1994) .................................11

*Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975) ...............24

*Lipsett v. University of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) ........................24

*Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019) ...........3, 9, 14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ..................................8, 26

*Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661 (7th Cir. 1996) ........................7

*Northeast Florida Chapter of Associated General Contractors of
America v. City of Jacksonville*, 508 U.S. 656 (1993) ..................................passim

*Powers v. Ohio*, 499 U.S. 400 (1991) .............................................................11

*Preston v. Virginia ex rel. New River Community College*,
31 F.3d 203 (4th Cir. 1994) ....................................................................24

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) ...................8

*Ryan v. Reno*, 168 F.3d 520 (D.C. Cir. 1999) ......................................................8

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard
College*, 600 U.S. 181 (2023) .......................................................................8, 15

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) .................................5, 7, 22, 26

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) ..............................5, 18, 21

*Texas v. Lesage*, 528 U.S. 18 (1999) ..................................................................28

*United States ex rel. Hanna v. City of Chicago*,
834 F.3d 775 (7th Cir. 2016) ....................................................................5

*Vengalattore v. Cornell University*, 36 F.4th 87 (2d Cir. 2022) ..............................24

*Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996) .........................24

**Statutes**

20 U.S.C. § 6301 ............................................................................................18

28 U.S.C. § 2201(a) .........................................................................................27

42 U.S.C. § 1981 ..................................................................................14, 27, 28

42 U.S.C. § 2000d-4a ..................................................................................15, 16

42 U.S.C. § 2000e–5(f)(1) ................................................................................25

**Rules**

Fed. R. Civ. P. 9(b) .........................................................................................5

**Other Authorities**

Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits,*
      *"Injuries," and Article III*, 91 Mich. L. Rev. 163 (1992) ..................................12

A plaintiff needs only to allege and not prove his claims at the motion-to-dismiss stage, and all factual allegations in the complaint must be presumed true and construed in the light most favorable to the plaintiff. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her."). FASORP has assuredly *alleged* standing and the existence of illegal race and sex discrimination under the rules of notice pleading. Whether FASORP will ultimately prove those allegations remains to be seen, but there is no remotely plausible basis for dismissing the lawsuit at this stage of the litigation.

## I.    RESPONSE TO THE DEFENDANTS' STATEMENT OF FACTS

The defendants misrepresent the first amended complaint when they accuse FASORP of attempting to establish illegal race and sex discrimination by "comparing the credentials of three white male professors who were not hired with the credentials of five Black professors . . . who were hired." Defs.' Br., ECF No. 33, at 3. FASORP's claims rest on former Dean Dan Rodriguez's illegal faculty-hiring edict, which instructs the faculty to discriminate in favor of non-white and non-male faculty candidates,[1] and on the fact that faculty members consciously and intentionally refuse to hire white male candidates *because* they are white men. *See, e.g.*, First Amended Complaint, ECF No. 25, at ¶ 20 ("[T]hen-Associate Dean Sarah Lawsky . . . expressly stated at a faculty meeting that she opposed Wurman's appointment to the faculty because he is a white man."); *id*. at ¶ 20 ("Janice Nadler also actively opposed Professor Wurman's appointment because she wants to hire women and nonwhites rather than white men, and she repeatedly and openly expresses that view to her colleagues.").

Some of the defendants' other statements are accurate but do nothing to support their arguments for dismissal. The defendants, for example, correctly observe that FASORP's members did not apply for the law school's deanship in 2022, when the chair of the dean's search committee rigged the process to ensure that a woman would be chosen for the job.

---

1.    See First Amended Complaint, ECF No. 25, at ¶¶ 11–14.

*See* Defs.' Br., ECF No. 33, at 4. But the dean's search episode is cited only to show how pervasive and corrupt the law school's use of race and sex preferences has become. FASORP is not seeking damages (or any other relief) on behalf of the men who were excluded from consideration for the deanship. It is seeking only *prospective* relief that will stop Northwestern from discriminating in the *future*. Past injuries do not establish standing to seek prospective relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210–11 (1995). The past job applications or article submissions of FASORP's members likewise have no bearing on standing or the merits, as no one in this case is seeking damages for past harms. *See* Defs.' Br., ECF No. 33, at 4. The past is relevant only as evidence to support FASORP's allegation that Northwestern *currently* discriminates on account of race and sex, and that Northwestern intends to continue these discriminatory practices unless the courts enjoin it from doing so.

The defendants are also correct to point out that FASORP's membership does not include Northwestern students who intend to apply for positions on the Law Review. *See* Defs.' Br., ECF No. 33, at 4. The complaint makes clear that FASORP's standing to sue over the Law Review's discriminatory membership-selection practices rests on its faculty members who will continue submitting their manuscripts to the Law Review. *See* First Amended Complaint, ECF No. 25, at ¶¶ 112–113. That does nothing to defeat FASORP's standing to sue over the Law Review's membership-selection policies, which dilute the quality of the students who decide whether to accept its members' submissions. *See id.* at ¶ 113; *infra* at 11–13.

## II.   FASORP Has Alleged Article III Standing

To defeat the defendants' facial Rule 12(b)(1) motion, FASORP needs only to *allege* that it has members who stand "able and ready to apply" for a faculty appointment at Northwestern or a publication slot in the Northwestern University Law Review, and that its members will encounter race or sex discrimination if they do so. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) ("Hamacher demonstrated that

he was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions. He therefore has standing to seek prospective relief with respect to the University's continued use of race in undergraduate admissions."); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis"). FASORP has done exactly that by alleging that Individuals A, B, and C are members of FASORP;[2] that they "stand[] able and ready to apply for a faculty appointment at Northwestern University's law school"[3] and that they "stand able and ready to submit . . . manuscripts to the Northwestern University Law Review for publication in future volumes";[4] and that they will encounter race and sex discrimination if they seek faculty appointments at Northwestern or submit their articles for placement in its law review.[5] Those allegations *must* be assumed true on a motion to dismiss,[6] and nothing more is needed to allege organizational standing at this stage of the litigation. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 262; *Jacksonville*, 508 U.S. at 666.[7]

---

2. First Amended Complaint, ECF No. 25, at ¶¶ 100, 102, 104.

3. First Amended Complaint, ECF No. 25, at ¶¶ 101, 103, 105.

4. First Amended Complaint, ECF No. 25, at ¶ 112.

5. First Amended Complaint, ECF No. 25, at ¶¶ 101, 103, 105, 112.

6. *See Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 806 (2019) ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true.").

7. The defendants misrepresent the first amended complaint by claiming that it contains only a "vague allegation Individuals A and C plan to express 'interest' in future years." Defs.' Br., ECF No. 33, at 7 (citing *Hummel v. St. Joseph County Board of Commissioners*, 817 F.3d 1010, 1019 (7th Cir. 2016)). The first amended complaint uses the magic words by alleging that Individuals A, B, and C stand "able and ready to apply for a faculty appointment at Northwestern University's law school"—and that Individuals A and C have *already* applied for lateral appointments by expressing interest to their contacts on the Northwestern faculty. *See supra* note 3.

For good measure, FASORP included additional details about Individuals A, B, and C, describing them as "qualified" for appointment[8] and mentioning that they currently hold tenured or tenure-track appointments at ABA-accredited law schools,[9] as well as providing the number of scholarly publications they have authored,[10] their years of teaching experience,[11] the fact that Individuals A and C had previously applied for entry-level faculty appointments at Northwestern's law school,[12] and the fate of their past submissions to the Northwestern University Law Review.[13] None of these factual details are needed to allege Article III standing, as FASORP needs only to assert that it has members who stand "able and ready" to apply for faculty appointments or article placements and that Northwestern's discriminatory practices prevent them from competing on an equal basis. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 262; *Jacksonville*, 508 U.S. at 666. But FASORP provided these allegations to avoid unnecessary quibbling over the rules of notice pleading—even though the Supreme Court and the Seventh Circuit have repeatedly and emphatically held that detailed factual allegations of this sort are not required at the pleading stage. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics"); *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (citation and some internal quotation marks omitted)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations"

---

8.   First Amended Complaint, ECF No. 25, at ¶¶ 109–111.
9.   First Amended Complaint, ECF No. 25, at ¶¶ 100, 102, 104.
10.   First Amended Complaint, ECF No. 25, at ¶¶ 109–111.
11.   First Amended Complaint, ECF No. 25, at ¶¶ 109–111.
12.   First Amended Complaint, ECF No. 25, at ¶ 107.
13.   First Amended Complaint, ECF No. 25, at ¶¶ 114–116.

(citation and internal quotation marks omitted)); *United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) ("Rule 8 requires notice pleading, not fact pleading."); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (Easterbrook, J.) ("Plaintiffs need not lard their complaints with facts; the federal system uses notice pleading rather than fact pleading."); *id.* ("[L]ack of detail does not permit dismissal."); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008) ("[T]he complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense."). Detailed factual allegations are needed when alleging fraud and mistake, *see* Fed. R. Civ. P. 9(b), but there are no heightened-pleading requirements when alleging race or sex discrimination. *See Swierkiewicz*, 534 U.S. at 514 (allowing "conclusory allegations of discrimination" to survive a motion to dismiss); *id.* at 515 ("[T]he Federal Rules do not contain a heightened pleading standard for employment discrimination suits."); *Burks*, 555 F.3d at 594 ("[K]nowledge and intent may be pleaded generally (which is to say, in a conclusory fashion)").

The defendants, however, insist that FASORP must provide *additional* details about Individuals A, B, and C, including:

- The time at which Individuals A and C previously applied for entry-level positions at Northwestern's law school;

- The time and manner in which Individuals A and C expressed "interest" in lateral faculty appointments at Northwestern;

- The law schools where Individuals A, B, and C currently teach;

- The time and subject matter of Individual A, B, and C's past submissions to the Northwestern University Law Review; and

- Whether Individuals A or C provided CVs, research agendas, writing samples, recommendations, or other materials to support their candidacies.

Defs.' Br., ECF No. 33, at 7. None of these details are necessary to allege Article III standing, and the defendants cite no authority that requires this level of factual detail under a regime of notice pleading. The defendants' insistence on these details contradicts not only the rules

of notice pleading[14] but also *Carney*, *Gratz*, and *Jacksonville*, which require nothing more than an allegation that an applicant stands "able and ready" to apply and that a discriminatory practice prevents him from competing with others on an equal basis. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 261; *Jacksonville*, 508 U.S. at 666. Nor is there any need to specify whether Individuals A and C's applications were "considered at the same time as those of the Black faculty discussed in the complaint." Defs.' Br., ECF No. 33, at 7. FASORP is suing for prospective relief, not damages, so it does not matter whether its members were passed over for Destiny Peery, Candice Player, or the other black professors that Northwestern hired because of their race. The complaint also makes clear that Northwestern is discriminating against white men in *all* faculty hiring cycles—regardless of whether a particular hiring cycle culminates in the hiring of a black faculty candidate. *See* First Amended Complaint, ECF No. 25, at ¶ 11–12. So FASORP's members are suffering ongoing injury simply from the fact that they will face a competitive disadvantage relative to female or minority faculty candidates when they apply, and that injury remains no matter whom Northwestern ultimately decides (or decided) to hire. And FASORP's members are suffering this ongoing injury regardless of whether they "asked [or] convinced any faculty member to intercede with the appointments committee," regardless of whether "the appointments committee or Dean was aware of their interest," and regardless of whether their lateral-appointment efforts were "rejected." Defs.' Br., ECF No. 33, at 7. FASORP is not suing for damages, so it is neither necessary nor relevant to allege past injury from a previously rejected application or a failed appointment effort. *See Lyons*, 461 U.S. at 102–03; *Adarand*, 515 U.S. at 210–11.

The defendants' remaining criticisms of the standing allegations are false or irrelevant. FASORP need not allege or show a categorical bar to the hiring of white men;[15] it is enough

---

14. *See supra* at 4–5 (citing authorities).
15. *See* Defs.' Br., ECF No. 33, at 8 ("FASORP acknowledges that Northwestern has interviewed and hired white male professors, underscoring that there is no race- or gender-based bar." (citation omitted)).

to allege that Northwestern gives discriminatory preferences to women and racial minorities, even though it occasionally (and reluctantly) hires white men in fields such as tax. The claim that the allegations of racial discrimination are "conclusory" and lack "supporting factual allegations"[16] is absurd, as the complaint is packed with detailed anecdotes explaining how Dan Rodriguez, Janice Nadler, Sarah Lawsky, and the chair of the 2022 dean's search committee purposefully and openly discriminate against white men.[17] There is also nothing wrong with "conclusory" allegations of discrimination (as opposed to legal conclusions),[18] as all factual allegations must be assumed true—including the factual allegation that Northwestern discriminates against white men in its faculty hiring. *See Swierkiewicz*, 534 U.S. at 514 (allowing "conclusory allegations of discrimination" to defeat a motion to dismiss); *Burks*, 555 F.3d at 594 ("[K]nowledge and intent may be pleaded . . . in a conclusory fashion").[19]

The defendants are equally wrong to claim that FASORP's members must allege that they are "qualified" to teach at Northwestern. *See* Defs.' Br., ECF No. 33, at 8. That requirement applies only to plaintiffs who bring disparate-impact claims over *past* employment practices under Title VII. *See Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 668 (7th Cir. 1996) ("We have relied on these standing principles to require an individual Title VII plaintiff *alleging disparate impact* to establish that he was qualified for the position sought." (emphasis added)). There is no requirement that plaintiffs who seek prospective relief against

---

16. Defs.' Br., ECF No. 33, at 8.

17. *See* First Amended Complaint, ECF No. 25, at ¶¶ 11–31.

18. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007) (refusing to accept allegations of illegal agreement that are "merely legal conclusions").

19. *See also Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992) (Posner, J.) ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, Fed. R. Civ. P. 8; *Elliott v. Thomas,* 937 F.2d 338, 345 (7th Cir. 1991), so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliché means, does not automatically condemn it. All the complaint need do to withstand a motion to dismiss for failure to state a claim is 'outline or adumbrate' a violation of the statute or constitutional provision upon which the plaintiff relies, and connect the violation to the named defendants." (some citations omitted)).

affirmative-action policies—which involve *purposeful* discrimination on account of race or sex rather than disparate impact—allege or prove that they are "qualified" for the sought-after position. *See Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) ("Whenever the government treats any person unequally because of his or her race, that person has suffered an injury."); *Northeastern Florida Chapter, Associated General Contractors of America v. Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment."); *Regents of University of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978) ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing."). The complaint in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), never alleged that the plaintiff's members were "qualified" to attend Harvard; it merely asserted that Harvard's admissions policies "have injured and continue to injure Plaintiff's members by intentionally and improperly discriminating against them on the basis of their race." Complaint, *Students for Fair Admission v. President and Fellows of Harvard College*, No. 1:14-cv-14176-ADB, ECF No. 1, at 1 (attached as Exhibit 1); *see also Students for Fair Admissions*, 600 U.S. at 199–201 (upholding SFFA's organizational standing to sue Harvard over its discriminatory admissions policies).

What's more, the requirement that a Title VII plaintiff allege and show that he is "qualified" for the job is part of the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which goes to the merits of a Title VII claim and has nothing to do with Article III standing. *See Cartagena v. Secretary of the Navy*, 618 F.2d 130, 132 (1st Cir. 1980) ("[T]he merits of a claim . . . must necessarily be scrutinized under the guidelines established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."); *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999) (similar). *Melendez* misleadingly implies that this is part of the Article III standing inquiry, but neither *Melendez* nor any other ruling of the Seventh Circuit holds that Article III standing doctrine requires an employment-discrimination plaintiff to allege or prove that he is "qualified" for the sought-after position—even if he must

make such a showing under *McDonnell Douglas*. In all events, the first amended complaint explicitly states that Individuals A, B, and C are "qualified" for faculty appointments at Northwestern and explains their qualifications,[20] and the Court must accept the truth of those allegations at the motion-to-dismiss stage. *See Manhattan Community Access Corp.*, 587 U.S. at 806. The defendants want the Court to disbelieve this factual allegation but that is not an option at this stage of the litigation, and FASORP is not required to prove its case at the motion-to-dismiss stage or plead every fact that might be conceivably relevant to the qualifications of its members. *Compare* Defs.' Br., ECF No. 33, at 8–9, *with Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations" (citation and internal quotation marks omitted)).[21]

The defendants are also wrong to suggest that FASORP must recite each relevant qualification of Individuals A, B, and C because it declared Destiny Peery and Candice Player "unqualified" and did so "based on the ranking of the law school they attended and their academic and publication records." Defs.' Br., ECF No. 33, at 10. The first amended complaint says nothing about where Player attended law school (she graduated from Harvard), and it does not claim that Peery was unqualified because she graduated from Northwestern. Perry was unqualified because: (1) Her law-school grades were abysmal and would have disqualified any non-black applicant from consideration for an appointment;[22] (2) Janice Nadler

---

20. *See* First Amended Complaint, ECF No. 25, at ¶¶ 109–111.

21. The defendants cite *Do No Harm v. Pfizer Inc.*, 646 F. Supp. 3d 490, 506 (S.D.N.Y. 2022), but that case was decided at the preliminary-injunction stage, where a plaintiff must *prove* and not merely allege standing. *See id.* at 499–500 ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment. Accordingly, to establish standing for a preliminary injunction, *a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts*, which for purposes of the summary judgment motion will be taken to be true." (emphasis added)). It is disingenuous for the defendants to suggest that this case establishes rules of pleading rather than evidentiary requirements for litigants seeking preliminary injunctions. *See* Defs.' Br., ECF No. 33, at 9.

22. *See* First Amended Complaint, ECF No. 25, at ¶ 21.

and Shari Diamond knew that Peery's grades would present an obstacle to her future appointment, which is why they pressured their colleagues to give Peery higher grades during her time as a student;[23] and (3) Law-school Dean Dan Rodriguez had to force Peery's appointment through the faculty by threatening to withhold bonuses from those who opposed the hiring.[24] Player was unqualified because: (1) She admitted to colleagues that she did not understand the material she was teaching and couldn't handle the students' questions;[25] (2) She plagiarized a final-exam question;[26] and (3) Neither Peery nor Player could obtain academic appointments after leaving Northwestern, despite the overwhelming discriminatory preferences that black women receive on the academic hiring market.[27]

More importantly, Northwestern is *not* breaking the law or injuring FASORP's members by hiring unqualified black professors. The Article III injuries (and the violations of federal law) arise because Northwestern is discriminating on account of race and sex in its faculty-hiring practices. That establishes Article III injury (and violates the law) regardless of whether its affirmative-action hires are "qualified" or "unqualified"—and regardless of whether FASORP's members have better or worse qualifications than the professors that Northwestern hires. The descriptions of Player and Peery in the first amended complaint do not change the rules of notice pleading or require FASORP to allege facts that have no relevance to Article III standing; they serve only to show the extent of corruption and lawlessness in Northwestern's faculty-hiring practices. If FASORP's members stand "able and ready to apply" and will face discrimination on account of their race and sex, then they have standing to sue over Northwestern's faculty-hiring practices. Nothing more is required.

---

23.  *See* First Amended Complaint, ECF No. 25, at ¶¶ 24–25.
24.  *See* First Amended Complaint, ECF No. 25, at ¶ 22.
25.  *See* First Amended Complaint, ECF No. 25, at ¶ 34.
26.  *See* First Amended Complaint, ECF No. 25, at ¶ 34.
27.  *See* First Amended Complaint, ECF No. 25, at ¶¶ 33, 35.

FASORP has also alleged standing to sue over the Law Review's membership- and editor-selection practices. FASORP claims that race and sex preferences dilute the quality of the students who edit and vote on submissions—and that allegation must be assumed true on a motion to dismiss. *See* First Amended Complaint, ECF No. 25, at ¶ 113. FASORP also alleges that students who obtain their Law Review positions through race and sex preferences are more likely to discriminate against articles submitted by white men at the article-selection stage. *See id.* All of this inflicts injury on Individuals A, B, and C, who stand "able and ready" to submit manuscripts to the Northwestern University Law Review.

The defendants deny that any of this constitutes "injury in fact." Defs.' Br., ECF No. 33, at 10–11. But these are no less Article III injuries than the injury alleged in *Powers v. Ohio*, 499 U.S. 400 (1991), where a white criminal defendant complained that the prosecutor had used his peremptory challenges in a racially discriminatory manner. *See id.* at 403–04. The Supreme Court held that the mere fact that the juror-selection process was tainted by unlawful racial discrimination inflicted injury on the criminal defendant who was to be judged by this improperly selected jury—even though the defendant had made no showing that excluded jurors were predisposed to rule in his favor, and even though the defendant had not alleged (and could not possibly show) that the excluded jurors were more qualified to serve than the jurors who were ultimately seated. *See id.* at 411 ("The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice."). It was enough for the defendant to show that the discriminatory practices had altered the composition of the jury that would decide his guilt or innocence, even though the defendant had no way of showing that the *outcome* of his trial had been affected in any way. *See also Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991) (extending *Powers* to civil litigants who allege racial discrimination in the juror-selection process); *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127 (1994) (extending *Powers* to litigants who allege sex discrimination in juror selection).

FASORP has an even stronger case for injury in fact because there are objective criteria that measure a student's ability and qualifications for membership on the Law Review—grades and performance on the writing competition—and the Law Review's policies have *subordinated* these merit-based criteria to race and sex preferences. FASORP can therefore plausibly allege—which the litigants in *Powers*, *Edmonson*, and *J.E.B.* could not possibly do—that the discriminatory practices have not only altered the composition of the students who decide whether an article will be accepted or rejected for publication, but have also diluted the credentials and aptitude of the students who judge a professor's articles.

The defendants try to defeat this by claiming that "'there is no legal right to have one's article reviewed or published by a student-run academic law journal.'" Defs.' Br., ECF No. 33, at 10–11 (quoting *FASORP v. New York University*, 2020 WL 1529311, *6 (S.D.N.Y. March 31, 2020)). But "legal right" is not the test for injury under Article III; the standard is injury in fact. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970); Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 185 (1992) ("[T]he *Data Processing* Court concluded that a plaintiff no longer needed to show a 'legal interest' or 'legal injury' to establish standing."). And a person suffers "injury in fact" whenever race or sex discrimination alters the composition of a body that sits in judge of his scholarship—in the same way that a criminal defendant suffers "injury in fact" when discriminatory juror-selection practices alter the composition of the body that decides his civil or criminal liability.

The defendants' attacks on FASORP's standing to sue over the Law Review's article-selection practices are even more baseless. FASORP is seeking only *prospective* relief directed toward the Law Review's *current and future* practices, so it does not matter whether the Law Review accepted or rejected its members' previously submitted articles. *See* Defs.' Br., ECF No. 33, at 11. Nor does it matter whether the previously rejected articles were turned away because of race or sex discrimination. *See id*. Nor does it matter whether those rejected articles were placed in comparable journals, or whether FASORP's members submitted articles to

the issue that the Law Review had set aside for black female authors. *See id.* Past injuries do not establish standing to seek prospective relief, and the absence of past injury does not defeat a litigant's standing to seek declaratory or injunctive remedies. *See Lyons*, 461 U.S. at 102–03; *Adarand*, 515 U.S. at 210–11; *but see* Defs.' Br., ECF No. 33, at 11 (complaining that "FASORP cannot show a past injury"). The Law Review's past acts of discrimination are mentioned only to show the plausibility of FASORP's claim that the Law Review *currently* uses race and sex preferences when selecting articles—and that it will continue doing so unless this Court tells it to stop.

The defendants also claim that FASORP fails to allege future injury, but FASORP needs only to allege that its members stand "able and ready" to submit manuscripts to the Law Review and that the Law Review's race and sex preferences prevent them from competing on an equal basis. *See Carney*, 592 U.S. at 60; *Gratz*, 539 U.S. at 262; *Jacksonville*, 508 U.S. at 666; *see also* First Amended Complaint, ECF No. 25, at ¶ 112 ("Individuals A, B, and C . . . stand able and ready to submit additional manuscripts to the Northwestern University Law Review for publication in future volumes. But the pervasive and ongoing use of race and sex preferences at the Northwestern University Law Review prevents Individuals A, B, and C from competing with other authors who submit articles to the law review on an equal basis."). There is no need for details about "the subject matter of the articles" or the "range of law reviews to which they will be submitted"[28]—none of which has any relevance to standing or the merits. *See Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations" (citation and internal quotation marks omitted)). FASORP's members will suffer injury in fact regardless of the content of their articles or the other journals where they will submit their manuscripts, because Northwestern will continue to discriminate against them based on race and sex.

---

28.   Defs.' Br., ECF No. 33, at 11.

The defendants falsely assert that the complaint "alleges no facts supporting the claim that the Law Review is likely to discriminate based on race or gender if its members ever actually submit articles in the future." Defs.' Br., ECF No. 33, at 11. The complaint alleges that the position of "senior equity and inclusion editor" was "created and exists for the very purpose of elevating submissions from authors with preferred demographic traits over better scholarship written by white men." First Amended Complaint, ECF No. 25, at ¶ 97. The complaint also states that the Law Review's publicly announced non-discrimination policy is "a bald-faced lie." *Id.* at ¶ 80. In all events, the complaint explicitly states that the Law Review "consistently gives discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people over better articles written by white men who are neither homosexual nor transgender" and that it "*will continue these discriminatory and unlawful article-selection practices* until a court enjoins it from doing so." First Amended Complaint, ECF No. 25, at ¶ 97 (emphasis added). The Court *must* accept these assertions as true, and it is not permitted to disbelieve a plaintiff's factual allegations at the motion-to-dismiss stage. *See Manhattan Community Access Corp.*, 587 U.S. at 806 ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true."); *Christopher*, 536 U.S. at 406 ("Since we are reviewing a ruling on motion to dismiss, we accept [the plaintiff's] factual allegations and take them in the light most favorable to her.").

## III. FASORP HAS ALLEGED A CLAIM ON WHICH RELIEF MAY BE GRANTED AGAINST NORTHWESTERN UNIVERSITY

The defendants say that FASORP has failed even to *allege* a claim against Northwestern University under Title VI, Title IX, or 42 U.S.C. § 1981. None of their arguments have merit.[29]

---

29. We have no quarrel with the defendants' request to dismiss the claims brought against the individual defendants, given their acknowledgement that declaratory and injunctive relief directed at Northwestern University will bind each of the individual defendants in their official capacities. *See* Defs.' Br., ECF No. 33, at 12–13.

A.    **FASORP Has Alleged A Title VI Claim Against Northwestern**

1.    **FASORP's Members Are "Applicants" To A Federally Funded Program, And They Are Also "Intended Beneficiaries" Of And "Participants" In A Federally Funded Program**

The defendants first observe that a Title VI plaintiff must be "the intended beneficiary of, an applicant for, or a participant in a federally funded program." Defs.' Br., ECF No. 33, at 13 (quoting *Doe v. St. Joseph's Hospital of Fort Wayne*, 788 F.2d 411, 418–29 (7th Cir. 1986)). FASORP's members easily satisfy this requirement because they are "applicants" to Northwestern University's faculty. *See* First Amended Complaint, ECF No. 25, at ¶¶ 108, 126. The defendants try to get around this by denying that Northwestern University qualifies as a "federally funded program," but they are wrong. *See* Defs.' Br., ECF No. 33, at 14 (arguing that FASORP's members should be deemed "'applicants' not to a federally-funded program, but rather to an institution that happens to receive federal funds."). Title VI defines "program" to include the entirety of a university that receives federal funds:

> For the purposes of this subchapter, the term "program or activity" and the term "program" mean all of the operations of— . . .
>
> (2)(A) a college, university, or other postsecondary institution, or a public system of higher education . . .

any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d-4a. So Northwestern University *is* a "federally funded program," and FASORP's members are "applicants" to that program.

The defendants' stance is also incompatible with *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), which allowed prospective applicants to sue Harvard under Title VI even though these students were "applicants" to Harvard College rather than a specific federally funded program within the university. *See* SFFA Complaint ¶ 15 (attached as Exhibit 1) ("SFFA has at least one member ('Applicant') who applied for and was denied admission to Harvard's 2014 entering class."); *id.* at ¶ 25 ("SFFA has members who are currently in high school and intend to apply for admission to

Harvard ('Future Applicants')). On the defendants' view, SFFA's Title VI claims should have been dismissed because its members were applicants to "an institution that happens to receive federal funds"[30] rather than applicants to a particular "program" within Harvard University that was using federal money.[31]

FASORP's members are also "intended beneficiaries of" and "participants in" the universities where they currently teach, which also qualify as "federally funded programs" under 42 U.S.C. § 2000d-4a. The defendants do not deny any of this, yet they insist that FASORP's members must be "intended beneficiaries of" or "participants in" Northwestern University rather than their current university employers. But nothing in *Doe* or *Ahern v. Board of Education of City of Chicago*, 133 F.3d 975 (7th Cir. 1998), imposes that requirement, and there is nothing anomalous about allowing faculty job-applicants from other federally funded universities to sue Northwestern under Title VI.[32] *Students for Fair Admission*, after all, allows high-school students who are not enrolled in *any* institution of higher learning to sue Harvard under Title VI's cause of action—simply because they intended to apply to Harvard in the future and stood "able and ready" to do so.

### 2. FASORP May Assert Employment-Discrimination Claims Under Title VI Because University Faculty Are The "Primary Beneficiaries" Of Federal Research Grants

The defendants' next move is to claim that FASORP cannot bring employment-discrimination claims under Title VI unless "'(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid.'" Defs.' Br., ECF No. 33, at 15 (quoting *Ahern*,

---

30. *See* Defs.' Br., ECF No. 33, at 14.
31. SFFA's members would not be able to qualify as "intended beneficiaries" or "participants" of Harvard University because none of them were students at Harvard when they sued.
32. *See* Defs.' Br., ECF No. 33, at 14 ("To conclude otherwise would make any entity liable under Title VI whenever someone happens to apply to that entity from any institution receiving federal funds.").

133 F.3d at 978). But FASORP has alleged that "university faculty are 'primary beneficiaries' of federal research grants,"[33] and the defendants do not dispute this claim. *See* Defs.' Br., ECF No. 33, at 16. Nor do the defendants deny that race and sex preferences in faculty hiring "necessarily cause[] discrimination against" university faculty. *See id*.

Instead, the defendants offer a bald assertion that "students" are the "primary beneficiaries of the federal aid," without any citation of authority and without explaining how students rather than faculty can be the "primary beneficiaries" of grants awarded to universities by the National Science Foundation, the National Institutes for Health, and the National Endowment for the Humanities. *See id*. Nor do the defendants even identify or describe the supposed "federal aid" that primarily benefits students rather than faculty members. If the defendants are suggesting that there are *some* sources of federal aid, such as Pell grants or subsidized loans, that primarily benefit students, then are we are willing to acknowledge that those particular sources of federal aid primarily benefit students rather than faculty members.[34] But the defendants cannot stack the deck by pretending that Northwestern accepts federal aid *only* from the student-loan programs that primarily benefit students, while ignoring the research-grant programs that primarily benefit faculty. Northwestern University accepts money from *many* different sources of federal aid—some of which primarily benefit students, and others that primarily benefit faculty. And the federal aid that Northwestern (and other universities) receive from the National Science Foundation, the National Institutes for Health, and the National Endowment for the Humanities primarily benefits university faculty, who conduct the research and scholarship that the federal government subsidizes. *See* Exhibits 2–4 (showing grants that Northwestern received from NSF, NIH, and NEH).

---

33.  First Amended Complaint, ECF No. 25, at ¶ 129.

34.  *Cf. American Institute of Design v. Riley*, 969 F. Supp. 936, 951 (E.D. Pa. 1997) ("The intended beneficiaries of federal loan programs are students—students are given federal loans to seek an education at a qualified institution"); *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 354 (S.D.N.Y. 2015) ("[S]tudent . . . are . . . the direct (and Congress's intended) beneficiaries of Title IV federal aid programs").

Racial preferences in faculty hiring "necessarily cause[] discrimination against the primary beneficiaries" of *this* federal aid.

The defendants cite *Cieslik v. Board of Education of City of Chicago*, No. 1:19-CV-05553, 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021), but that case is no help because it holds only that "students . . . are the primary beneficiaries *of Title I funding*." *Id.* at *3 (emphasis added). Northwestern University does not receive Title I money, which funds elementary and secondary schools rather than universities. *See* 20 U.S.C. § 6301 *et seq. Cieslik* does not hold that students are the only possible "primary beneficiaries" of every source of federal aid that might be provided to Northwestern University, including the research-grant programs that primarily benefit faculty rather than students.

### 3. The Defendants' Claims That FASORP Alleged "Insufficient Facts" Are Meritless

The defendants continue to carp about the complaint's supposed failures to plead "specific facts," and they repeat their tired refrain that the allegations of race and sex discrimination are "conclusory." *See, e.g.*, Defs.' Br., ECF No. 33, at 16 ("[T]he faculty hiring allegations in the FAC are too nonspecific and conclusory"); *id.* at 17 ("FASORP does not plead any specific facts necessary to support this conclusory assertion"). The defendants' charges are false and legally irrelevant. Every single claim of race and sex discrimination is supported by specific factual allegations that *must* be assumed true on a motion to dismiss, and that easily satisfy the rules of notice pleading by enabling the defendants to investigate and prepare their defense. *See Tamayo*, 526 F.3d at 1085 ("[T]he complaint merely needs to give the defendant sufficient notice to enable him to begin to investigate and prepare a defense.").

With respect to racial discrimination in faculty hiring, the complaint specifically alleges that:

- Former Dean Dan Rodriguez imposed a mandate requiring Northwestern's law school to hire as many non-white and non-male faculty candidates as possible, and that mandate remains in effect today. *See* First Amended Complaint, ECF No. 25, at ¶¶ 11–12.

- Dean Rodriguez knew that his discriminatory hiring edict was illegal and ordered the Northwestern faculty to never discuss candidates for hiring over the faculty listserv to minimize the risk of lawsuits, a ban that remains in effect today. *See id*. at ¶ 13.

- Rodriguez blocked the candidacies of Eugene Volokh and Ernie Young because they are white men, even though Volokh and Young are far more accomplished and distinguished than the female and minority faculty candidates that Northwestern hires. *See id*. at ¶¶ 15–19.

- Numerous law professors at Northwestern, including Vice Dean Emily Kadens, openly said that Professor Volokh would have been hired at Northwestern had he been anything other than a white man. *See id*. at ¶ 17.

- Professor Sarah Lawsky openly stated at a faculty meeting that she opposed Ilan Wurman's appointment to the faculty because he is a white man, and Wurman was defeated in a faculty vote after Lawsky made this remark even though the hiring committee had unanimously recommended Wurman's appointment. *See id*. at ¶ 20.

- Professor Janice Nadler openly opposed Wurman's appointment because she wants to hire women and non-whites rather than white men, and she repeatedly and openly expresses that view to her colleagues. *See id*. at ¶ 20.

- Northwestern hired a patently unqualified black female professor named Destiny Peery, who had graduated near the bottom of her law-school class even though the Northwestern faculty was aware of her abysmal academic record and even though several faculty members expressed concerns that Peery was unqualified and incapable of producing serious scholarship. *See id*. at ¶ 21.

- A candidate with a law-school record like Peery's would not even be considered for a tenure-track position at Northwestern in the absence of racial preferences. *See id*. at ¶ 26.

- Then-Dean Rodriguez ramrodded Peery's appointment through the faculty by threatening to withhold bonuses from faculty members who voted against her. *See id*. at ¶ 22.

- Numerous faculty members openly stated that Peery was hired only because of her race. *See id*. at ¶ 23.

- Peery was hired over white male candidates who were vastly more capable and qualified than she was. *See id*. at ¶ 23.

- Professors Janice Nadler and Shari Diamond pressured other instructors at Northwestern to give Peery higher grades when she was a student in an attempt to groom Peery for a future appointment to the faculty. *See id*. at ¶ 24.

- Professor Nadler intentionally misrepresented Peery's publication record to her colleagues when Peery was up for retention, and did so because Peery is black and Nadler wanted a black professor promoted. *See id*. at ¶¶ 28–31.

- Northwestern hired another unqualified black female professor named Candice Player, who admitted to colleagues that she did not understand the material she was teaching and couldn't handle the students' questions, and who plagiarized a final-exam question. *See id*. at ¶ 34.

- Northwestern hired Peery only because of her race and Peery never would have been considered for an appointment if she had been white. *See id*. at ¶ 36.

- Paul Gowder, Jamelia Morgan, and Myriam Gilles were hired because they were black and because Northwestern was determined to hire black professors and unwilling to consider white men for those positions. *See id*. at ¶¶ 37–42.

- Northwestern's law-school deans ensure that faculty members who are known to oppose discriminatory race and sex preferences are never selected for the appointments committee. *See id*. at ¶ 43.

- Northwestern's law school will never hire white men unless they work in a high-demand and low-supply field (such as tax) where it is difficult or impossible to find female or minority scholars, and they will never hire white men to teach in public law no matter how stellar their credentials are. *See id*. at ¶ 45.

- Myriam Gilles is a serial plagiarist, but Northwestern has no intention of taking any action against Gilles's plagiarism because she is black. *See id*. at ¶¶ 52–77.

Despite all of this, the defendants have the temerity to say that "the faculty hiring allegations in the FAC are too nonspecific and conclusory to state a claim." Defs.' Br., ECF No. 33, at 16. Yet the complaint documents the specific episodes of race and sex discrimination, identifies by the name the black professors who were hired because of their race (as well as the better qualified white male professors who were passed over because of their race and sex), calls out the faculty members who push for these illegal hiring practices, and describes their

specific discriminatory acts. The defendants' argument is nothing short of willful blindness to the contents of the complaint and the rules of notice pleading. *See Iqbal*, 556 U.S. at 678 ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations" (citation and internal quotation marks omitted)).

The defendants' criticisms of the Law Review allegations fare no better. The complaint alleges that the Law Review solicits "personal statements" from student applicants and uses them "to discriminate against white men and in favor of women, racial minorities, homosexuals, and transgender people." First Amended Complaint, ECF No. 25, at ¶ 80; *see also id.* at ¶ 81 ("The personal statements are relied upon solely for the purpose of awarding discriminatory preferences to women, racial minorities, homosexuals, and transgender people who would not have earned a position on the law review with their academic credentials and performance, at the expense of white men who are neither homosexual nor transgender."). These allegations must be assumed true on a motion to dismiss, and they provide all the factual detail needed for the defendants "to begin to investigate and prepare a defense." *Tamayo*, 526 F.3d at 1085. The complaint also points out that the Law Review in 2021 rejected "a white male student who had a first-year grade point average of over 4.0, while accepting female and minority students with much lower first-year grades." First Amended Complaint, ECF No. 25, at ¶ 83. The defendants note that this anecdote does not *prove* race or sex discrimination,[35] but it is surely enough to support the *plausibility* of the race-and-sex-discrimination claims, which is all that is needed at the motion-to-dismiss stage. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement'").

In all events, the courts *must* accept the truth of FASORP's claim that the Law Review uses personal statements to discriminate against white men and give preferences to women, racial minorities, homosexuals, and transgender people who would not have earned their positions on the Law Review based on merit. *See* First Amended Complaint, ECF No. 25, at

---

35.   *See* Defs.' Br., ECF No. 33, at 17.

¶¶ 80–81. The defendants note that the mere solicitation of personal statements does not violate the law,[36] but FASORP is alleging that the Law Review is soliciting personal statements *and using them for the sole purpose of discriminating* against white men. *See id.* That indisputably violates federal law, and neither the defendants nor this Court can deny the truth of this factual allegation at this stage of the proceedings.

As for article selection: There is no need for the complaint to identify a "specific article" that was "rejected . . . based on the author's race." Defs.' Br., ECF No. 33, at 18. It is enough to allege that that Law Review "gives discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people" and to support that allegation by identifying an issue of the Law Review that the editors knowingly and illegally reserved for articles written only by black women—including an article that contained extensive plagiarism that the law review's citecheckers deliberately or negligently overlooked. *See* First Amended Complaint, ECF No. 25, at ¶¶ 84–85; *see also id.* at ¶ 84 ("The editors of Volume 118, which was published during the 2023–2024 school year, decided that they would publish an entire issue that would consist only of articles written by black women."). That is an illegal racial set-aside or quota, and it violates both Title VI and Title IX.

FASORP is not required to identify the "publication-worthy articles by authors of other races" that the Law Review rejected. *See* Defs.' Br., ECF No. 33, at 18. None of that is needed to allege a violation of Title VI and Title IX, as a conscious decision to set aside an entire issue of the Law Review for articles written only by black women is illegal regardless of whether "otherwise publication-worthy articles" from men or members of other races were submitted. And if proof of these rejected submissions were needed, those details can be unearthed in discovery, as complaints are not required to include "detailed factual allegations" of this sort. *Iqbal*, 556 U.S. at 678; *see also Swierkiewicz*, 534 U.S. at 514 (allowing "conclusory allegations of discrimination" to survive a motion to dismiss); *Burks*, 555 F.3d at 594

---

36.  *See* Defs.' Br., ECF No. 33, at 17 ("[T]he mere fact that the Law Review solicits personal statements does not itself suffice to state a discrimination claim.").

("[K]nowledge and intent may be pleaded . . . in a conclusory fashion"). Nor does it matter whether the Law Review publicly announced its decision to set aside an entire issue for articles written by black women, as race and sex discrimination in article selection is illegal regardless of whether it is publicly acknowledged. *See* Defs.' Br., ECF No. 33, at 18–19 ("FASORP admits that the Law Review did not announce a policy of selecting only articles written by Black women for that issue.").

The defendants also remain oblivious to the fact that FASORP is suing only for prospective relief and not damages. See *First* Amended Complaint, ECF No. 25, at ¶ 153. So there is no need for FASORP to allege (or prove) that its members submitted articles for the black-women-only issue, as that would not establish standing or an entitlement to forward-looking relief. *Compare Lyons*, 461 U.S. at 102–03, *with* Defs.' Br., ECF No. 33, at 19 ("Nor does FASORP allege that any of its members submitted articles for this issue."); *id.* ("Absent any specific allegation suggesting the Law Review *denied* [past] publication opportunities based on race, FASORP fails to state a Title VI claim." (emphasis added)). FASORP is seeking to enjoin the Law Review's present and future acts of discrimination, and its anecdotes of past discrimination serve only to show the plausibility of its claim that the Law Review, as a matter of ongoing, routine practice, discriminates on account of race and sex.

Finally, the defendants repeatedly suggest that FASORP has pleaded itself out of court by acknowledging the Law Review's non-discrimination policy. *See* Defs.' Br., ECF No. 33, at 18 ("[A]s FASORP concedes, the Law Review expressly represents that it "does not discriminate on the basis of race.""); *id.* at 16–17 (similar). But the complaint says that the Law Review is lying when it claims not to discriminate on account of race, sex, sexual orientation, or gender identity,[37] and the courts must accept the truth of that allegation rather than the representations of the Law Review.

---

37. See First Amended Complaint, ECF No. 25, at ¶ 80 ("On its website, the . . . Law Review claims that it 'does not discriminate on the basis of race, ethnicity, religion,

### B. FASORP Has Alleged A Title IX Claim Against Northwestern With Respect To Sex Discrimination On The Law Review

The Seventh Circuit has held that employment-discrimination claims cannot be litigated under Title IX if Title VII would provide an equivalent remedy. *See Waid v. Merrill Area Public Schools*, 91 F.3d 857, 861–63 (7th Cir. 1996) (citing *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981)); *see also Agbefe v. Board of Education of City of Chicago*, 538 F. Supp. 3d 833, 840 (N.D. Ill. 2021) ("*Waid . . .* held that Title VII precludes other causes of actions for employment discrimination to the extent that Title VII would provide an equivalent remedy."). The Seventh Circuit is an outlier among the circuits on this issue.[38] The Seventh Circuit's stance is also hard to square with *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 (1975), which states in no uncertain terms that Title VII does *not* preclude victims of employment discrimination from pursuing remedies provided by other federal anti-discrimination statutes. *See id.* at 459 ("Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, *the aggrieved individual clearly is not deprived of other remedies he*

---

socioeconomic background, disability, nationality, sexual orientation, gender orientation and identity, or ideological perspective.' *See Diversity and Inclusion*, Northwestern University Law Review, http://bit.ly/3wcxzIx [https://perma.cc/RZC9-QQ2U]. *That is a bald-faced lie.* The . . . Law Review discriminates on the basis of race, sex, sexual orientation, and gender identity by using affirmative action to select its members, editors, and articles." (emphasis added)).

38. *See Vengalattore v. Cornell University*, 36 F.4th 87, 106 (2d Cir. 2022) ("We . . . hold that Title IX allows a private right of action for a university's intentional gender-based discrimination against a faculty member, and that Vengalattore's Title IX claim should not have been dismissed on the ground that he complained of such discrimination with respect to employment."); *Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 560 (3d Cir. 2017) ("Title VII's concurrent applicability does not bar Doe's private causes of action for retaliation and *quid pro quo* harassment under Title VII."); *id.* at 563 ("[W]e decline to follow *Lakoski* and *Waid*, both of which went against the First and Fourth Circuits' decisions recognizing employees' private Title IX claims."); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895–97 (1st Cir. 1988) (allowing employment-discrimination claims to proceed under both Title IX and Title VII); *Preston v. Virginia ex rel. New River Community College*, 31 F.3d 203, 206 (4th Cir. 1994) (same).

---

*possesses and is not limited to Title VII in his search for relief.* [T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." (citation and internal quotation marks omitted)). But FASORP acknowledges that *Waid* remains binding precedent in this Court, although it wishes to preserve for appeal its contentions that *Waid* should be considered or overruled.

FASORP also agrees with the defendants that its faculty-hiring claims cannot proceed under Title IX at this time given the holding of *Waid. See* Defs.' Br., ECF No. 33, at 19–20. And although FASORP has filed a charge of discrimination with the EEOC and requested a right-to-sue letter, it cannot bring a Title VII claim at this time because the EEOC has not yet issued a letter authorizing suit. *See* 42 U.S.C. § 2000e–5(f)(1) (requiring issuance of a right-to-sue letter before private litigant can bring a Title VII claim); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47 (1974) (describing right-to-sue letter as a "jurisdictional prerequisite" to a Title VII suit). When the EEOC issues a right-to-sue letter, FASORP will seek leave to add a Title VII claim, which will encompass the allegations of sex discrimination in faculty hiring that appear throughout the complaint. The defendants also complain that the allegations of sex discrimination on the Law Review are "vague and conclusory,"[39] but they are backed by specific anecdotes and the Court must accept the plaintiffs' factual allegations of sex discrimination at this stage of the litigation.

### C.    FASORP Has Alleged A Section 1981 Claim Against Northwestern

FASORP is not suing for damages over Northwestern's past acts of racial discrimination; it is seeking only prospective relief that will restrain Northwestern from using racial preferences in its future decisions. So there is no need for FASORP to allege or show that its members "applied" or were "qualified" for previously open positions, or that they were "rejected" for such positions in favor of an individual of another race. And even if FASORP were

---

39.   Defs.' Br., ECF No. 33, at 20 (quoting *Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802, 811 (7th Cir. 2021)).

required to make this showing, *Swierkiewicz* explicitly holds that employment-discrimination plaintiffs are not required to plead the elements of a prima facie case under *McDonnell Douglas. See Swierkiewicz*, 534 U.S. at 515 ("[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination"); *id.* at 511 ("[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case"); *Graham v. Board of Education*, 8 F.4th 625, 627 (7th Cir. 2021) ("[F]act pleading to show a prima facie case is not needed in an employment-discrimination case. Neither *Twombly* nor *Iqbal* questions the continuing force of *Swierkiewicz*. It is enough for a plaintiff to assert that she was treated worse because of protected characteristics."). The defendants are insisting that FASORP plead the very elements of a "prima facie case" that *Swierkiewicz* and *Graham* hold are *not* required in a complaint. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ("The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."); *see also Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002) (describing the elements of a "prima facie case of the employer's discriminatory intent"); Defs.' Br., ECF No. 33, at 21 (citing *Bennett*).

There is also no need to allege "but-for causation" when FASORP is not seeking damages or retrospective relief over the "'loss of a legally protected right.'" Defs.' Br., ECF No. 33, at 23 (quoting *Comcast Corp. v. National Ass'n of African-American Owned Media*, 589 U.S. 327, 341 (2020)). FASORP is seeking only forward-looking relief, so the pleading and proof requirements are no different from those in lawsuits seeking to enjoin racial discrimination under the Equal Protection Clause. *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003)

("[T]he prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause."); *Gratz*, 539 U.S. at 276 n.23 ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981.").

Plaintiffs that seek to *enjoin* affirmative-action policies under 42 U.S.C. § 1981 are not required to prove but-for causation; they need only satisfy the four-part test for a permanent injunction. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). And a plaintiff that seeks a *declaration* of his statutory rights under 42 U.S.C. § 1981 (or any other statute) needs only to show that he is an "interested party seeking such declaration," *i.e.*, that his request for declaratory relief satisfies Article III's case or controversy requirement by redressing an injury in fact. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). FASORP easily clears these hurdles because it alleges that its members stand "able and ready" to apply for faculty positions at Northwestern's law school and submit articles to its law review, and that they will encounter racial discrimination at the hands of the defendants absent declaratory and injunctive relief. Nothing more is needed to state a claim for prospective relief under 42 U.S.C. § 1981. And *Gratz* proves this because it awarded relief under 42 U.S.C. § 1981 simply because the plaintiffs had shown that: (1) They were "able

and ready to apply" to the University of Michigan,[40] and (2) They would encounter unconstitutional racial discrimination if they were to apply to the university in the future. *See Gratz*, 539 U.S. at 276 ("[B]ecause the University's use of race in its current freshman admissions policy is not narrowly tailored to achieve respondents' asserted compelling interest in diversity, the admissions policy violates . . . 42 U.S.C. § 1981.").[41]

Finally, FASORP need not allege a "contract" between the Law Review and its student members and editors because FASORP is pursuing a 42 U.S.C. § 1981 claim only on behalf of its faculty members, and it has alleged that student members and editors who are chosen because of racial preferences are more likely to discriminate against articles written by white men than students who earn their positions on the Law Review through academic merit. *See* First Amended Complaint, ECF No. 25, at ¶ 113. This impairs the ability of FASORP's faculty members to compete for contracts with the Law Review on equal terms with members of other races.

## CONCLUSION

The Court should dismiss the claims brought against the individual defendants, as well as the Title IX claims that allege sex discrimination in faculty hiring. The Court should deny the defendants' motion to dismiss the first amended complaint in all other respects.

---

40. *See Gratz*, 539 U.S. at 260–68.

41. To be sure, the plaintiffs in *Gratz* could not have obtained *damages* from the defendants—under either 42 U.S.C. § 1981 or the Equal Protection Clause—absent proof of but-for causation, *i.e.*, proof that the university's affirmative-action policies caused them to be rejected when they would have been accepted under a colorblind admissions process. *See Texas v. Lesage*, 528 U.S. 18, 20–21 (1999); *Babb v. Wilkie*, 589 U.S. 399, 413 (2020). But FASORP is not seeking damages or retrospective relief in this lawsuit.

Respectfully submitted.

 /s/ Jonathan F. Mitchell 

JUDD E. STONE II*                          JONATHAN F. MITCHELL
CHRISTOPHER D. HILTON*                      Mitchell Law PLLC
ARI CUENIN*                                111 Congress Avenue, Suite 400
Stone | Hilton PLLC                        Austin, Texas 78701
1115 West Slaughter Lane                   (512) 686-3940 (phone)
Austin, Texas 78748                        (512) 686-3941 (fax)
(737) 465-3897 (phone)                     jonathan@mitchell.law
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

REED RUBINSTEIN*
RYAN GIANNETTI*
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org
ryan.giannetti@aflegal.org

* admitted *pro hac vice*

Dated: December 23, 2024                   *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on December 23, 2024, I served this document through CM/ECF upon:

Danielle Conley
Jude Volek
Christine C. Smith
Jasmine D. Benjamin
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200 (phone)
(202) 637-2201 (fax)
danielle.conley@lw.com
jude.volek@lw.com
christine.smith@lw.com
jasmine.benjamin@lw.com

Sean Berkowitz
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
(312) 876-7700 (phone)
(312) 993-9767 (fax)
sean.berkowitz@lw.com

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff*